(C.D. 2357)

E. DILLINGHAM, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided September 18, 1962)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *E. Thomas Honey* of counsel) for the plaintiff.

*Joseph D. Guilfoyle*, Acting Assistant Attorney General (*Samuel D. Spector* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The four protests enumerated in the schedule, annexed to and made a part hereof, were consolidated for the purpose of these proceedings. They relate to importations described on the invoices as copper rod, with other words of description, exported from Brockville, Ontario, Canada, by the Phillips Electrical Works, Ltd. The merchandise was consigned to the Rockbestos Products Corp., New Haven, Conn., and the General Electric Co., Bridgeport, Conn., respectively.

The collector of customs classified the importations as copper wire and imposed duty at the rate of 12½ per centum ad valorem as provided in paragraph 316(a) of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 316(a)), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739.

Plaintiff claims that the merchandise should be classified as copper in rods within the provisions of paragraph 381 of said act (19 U.S.C. § 1001, par. 381), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and subjected to duty at the rate of 1¼ cents per pound.

The pertinent text of the statutes above referred to is here set forth.

Paragraph 316(a) of the Tariff Act of 1930, as modified by the Torquay protocol, *supra:*

Wire composed of iron, steel, or other metal, not specially provided for (except gold, silver, platinum, tungsten, or molybdenum)\_\_\_ 12½% ad val.

Paragraph 381 of said act, as modified by the General Agreement on Tariffs and Trade, *supra:*

Copper in rolls, rods, or sheets_____ 1¼¢ per lb.

It appears from the record that some of the importations were described as copper rod, five-sixteenths of an inch in diameter, represented by plaintiff's illustrative exhibit 1, while the other importations were described as copper rod, one-fourth inch in diameter, represented by plaintiff's illustrative exhibit 2.

Several other exhibits were introduced which may be referred to wherever necessary in the course of our opinion.

The four witnesses who testified in the case were called by the plaintiff.

The first witness, Carl Lee Shermann, chief technical officer of the Phillips Electrical Works, Ltd., who exported the merchandise and with which company he had been associated since 1934, is a graduate metallurgic engineer, holding degrees of bachelor of science and master of science from the University of Toronto.

Shermann testified that his company produces copper rods and wire cables, bare and insulated for the electrical industry. When asked to explain the term "bare," he said it means it is uninsulated.

As engineer in charge of production and of the testing and quality control department, he described the method of production of the importations represented by exhibits 1 and 2, as follows: "The initial product is a copper wire-bar. It is heated, and hot-rolled through a series of mills, into a round, solid form. This particular material here was then given a single reduction, by drawing." In that condition, after being coiled, it was imported into the United States. It appears that the normal method of shipping copper rods is in coils.

The witness then testified to his familiarity with the production of copper wire which his company also produces and which he recognizes as wire different from rod because "If we're producing a wire, we have to start with a sufficiently large size rod to give us the physical properties required by the specifications, the wire specifications involved. * * * Besides the difference in physical properties, there is a difference in the surface quality." He also added that exhibits 1 and 2 do not have a sufficiently clean surface to be recognized as wire.

By reason of his dealings and contacts with the trade in the United States in the normal conduct of his business, Shermann had acquired a familiarity with the materials known and used as wire and as rod in the United States. He stated that in making wire out of exhibits 1 and 2 they are—

* * * fed into a wire drawing machine, normally of multi-die arrangement, and reduced, cold, through these dies to the required size. You start with a feed, or redraw rod, to end up with the properties required in the finished wire.

Shermann testified that exhibits 1 and 2 would not be used as wire either in Canada or the United States since the trade in both countries

recognizes the standards of the American Society for Testing Materials (ASTM), a copy of which was received in evidence as plaintiff's exhibit 3.

The word "rod" in the "1952 Book of ASTM Standards," page 149, is defined as follows:

Rod.—A round, hexagonal or octagonal solid section. Round rod for further processing into wire (known as "hot-rolled rod," "wire-rod," or "redraw wire") is furnished coiled. Rod for other uses is furnished in straight lengths.

The witness was clearly of the opinion that exhibits 1 and 2 fall within that definition.

On cross-examination, Shermann testified that further drawings were necessary to transform exhibits 1 and 2 into wire. Drawing is the reduction by pulling the material through a sizing die of smaller diameter than that of the imported material. The drawing causes a portion of the surface and subsurface oxidations of the rod to be spalled or scraped off, and, basically, drawing is a reduction in diameter and elongation. It appears further that while a rod may be drawn, rolled, or extruded, wire is the product of a drawing process.

The witness Shermann, who is eminently qualified as a metallurgist and thoroughly familiar with the substance, character, quality, production, nomenclature, and utility of copper wire and copper in rods, established to our satisfaction that the importations in controversy are not copper wire but are copper in rods and are within the specifications of the American Society for Testing Materials (exhibit 3).

Plaintiff's second witness, Raymond Miniter, testified that, for the past 15 years, he had been purchasing agent for the Rockbestos Wire & Cable Co., division of Cerro Corp. (formerly Rockbestos Products Corp.), and engaged in the production of insulated electrical wires and cables. His company purchased some of the imported merchandise from Phillips Electrical Works and, after it had been drawn by the Anaconda Wire & Cable Co. and various other companies, received it in the form of wires and cable.

Based upon his experience of some 15 years during which he had purchased this material, Miniter stated that the ASTM standards are authoritative in the industry and that exhibits 1 and 2 are not recognized in the trade as wire. Through this witness, copies of purchase orders of merchandise, such as exhibits 1 and 2, identified as copper rod, were received in evidence as plaintiff's exhibits 6, 7, 8, and 9.

Plaintiff's third witness, Joel Aloisuis Havern, stated that, for the past 11 years, he had been purchasing agent in the cable department of the metallurgical and chemical division of the General Electric Co. at Bridgeport, Conn., and had been employed by the company altogether 39 years, issuing "* * * purchase orders that cover the fabrication of copper bars to rod." During the past 18 years, he had been engaged in the operation of converting copper rods, such as exhibits

1 and 2, into copper wire. Based upon his long experience with the company, he was clearly of the opinion that exhibits 1 and 2 are within the meaning of the term "rods." Havern was intimately familiar with the manner in which materials, such as exhibits 1 and 2, are processed to produce copper wire, having observed that operation thousands of times at their Bridgeport plant.

Plaintiff's fourth witness, Thomas V. Gargan, stated that, since December 1959, he had been manager of sales of copper rods with the Anaconda Wire & Cable Co., located at Hastings-on-the-Hudson, N.Y.; that he was employed by Anaconda in 1920 as a blast furnace foreman and had been a salesman for the products of that company until 1959 when he became manager of rod sales. This witness was well qualified by experience and training with the production and sale of copper rods and wire. Gargan's testimony fully corroborates that of the previous witnesses that the material represented by exhibits 1 and 2 is, in fact, copper in rods and is not copper wire.

Without further analysis of the testimonial record, which is not contradicted or refuted in any way, we are of the considered opinion that the record clearly establishes that the merchandise involved is not copper wire but is, in fact, copper in rods.

Based upon the record before us and for the reasons stated, we find and hold that the merchandise in controversy should be classified as copper in rods within the provisions of paragraph 381, as modified, *supra*, and properly dutiable at 1¼ cents per pound. That claim in the protests is, therefore, sustained.

Judgment will be entered in harmony with the views above expressed.