The KANTHAL CORPORATION

v.

UNITED STATES.

**C.D. 4644, Court No. 68/4195 etc.**

United States Customs Court.

April 1, 1976.

Barnes, Richardson & Colburn, New York City (James Caffentzis and Rufus E. Jarman, Jr., New York City, of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (John N. Politis, trial atty., and Andrew P. Vance, Chief, Customs Section, New York City), for defendant.

LANDIS, Judge:

The overriding question in these cases, consolidated for trial,[1] is whether certain metal products imported from Sweden during the period 1966–1970, are "wire rods," of alloy iron or steel, tempered, treated or partly manufactured, as contended by plaintiff under TSUS item 608.78, or were properly classified by customs as "round wire" of alloy iron or steel, under TSUS item 609.45, as modified by T.D. 68–9.[2]

Wire rod and round wire, which are the subject of this controversy between the parties, are provided for in TSUS schedule 6, part 2, subpart B. Part 2 and subpart B of schedule 6 contain special rules of interpretation and define important terms, in pertinent part, as follows:

SCHEDULE 6.—METALS AND METAL PRODUCTS

PART 2.—METALS, THEIR ALLOYS, AND THEIR BASIC SHAPES AND FORMS

* * * * * *

Subpart B.—Iron or Steel

Subpart B headnotes:

1. This subpart covers iron and steel, their alloys, and their so-called basic shapes and forms, and in addition covers iron or steel waste and scrap.

* * * * * *

3. *Forms and condition of Iron or Steel.*—For the purposes of this subpart, the following terms have the meanings hereby assigned to them:

* * * * * *

(f) *Wire rods*: A coiled, semifinished, hot-rolled product of solid cross section, approximately round in

1. There are thirty consolidated cases.

2. Duty was assessed at various rates ranging from 12.5 per centum ad valorem on importa-

tions prior to 1968 to 11 per centum ad valorem on importations in 1970.

cross section, not under 0.20 inch nor over 0.74 inch in diameter.

\* \* \* \* \* \*

(i) *Wire*: A finished, drawn, non-tubular product, of any cross-sectional configuration, in coils or cut to length, and not over 0.703 inch in maximum cross-sectional dimension. The term also includes a product of solid rectangular cross section, in coils or cut to length, with a cold-rolled finish, and not over 0.25 inch thick and not over 0.50 inch wide.

Wire rod and round wire are classified under Subpart B, in pertinent part, as follows:

Wire rods of iron or steel:

\* \* \* \*

Alloy iron or steel:

| | | |
|---|---|---|
| 608.76 | Not tempered, not treated, and not partly manufactured . . . . . . . | \* \* \* |
| 608.78 | Tempered, treated, or partly manufactured . . | 0.375¢ per lb. + 4% ad val. + additional duties (see headnote 4) |

\* \* \* \*

Wire of iron or steel:

\* \* \* \*

Round wire:

\* \* \* \*

| | | |
|---|---|---|
| 609.45 | Alloy iron or steel . . . . . . | [Various rates depending on dates of importation] + additional duties (see headnote 4) |

The pleadings filed by both sides concede that the imported products were imported in a coiled form; that they are of solid cross section, and that they are not under 0.20 inch nor over 0.74 inch in diameter. To the that extent, the imported products meet the specifications, both for "wire rods," and "wire".[3] Defendant has denied plaintiff's allegations that the imported products are definitionally "approximately round," "semi finished," "hot-rolled," wire rod.

On trial plaintiff adduced testimony from three witnesses in its employ and intro-duced four illustrative exhibits in evidence. Exhibit 1 is a physical sample of the imported products in the condition imported which, as the record attests, is a hot-rolled product drawn one time through a die. Exhibits 2, 3, and 4 are physical samples of resistance (electrical) wire which plaintiff processed (by further drawing) in the United States from products in the condition of the imported products (exhibit 1). Defendant also produced three witnesses, adduced their testimony, and introduced four exhibits in evidence. Exhibit A is a physical sample of a hot-rolled wire rod, not drawn; exhibit B is a metal die with an opening 0.204 inch in diameter for drawing wire rod or wire, and exhibit C is a physical sample of a product produced by cold-drawing exhibit A through the metal die (exhibit B). Exhibit D is a booklet published by the public relations department of the American Iron and Steel Institute entitled "Steel Processing Flow Charts". Its evidentiary value is limited to the schematically pictured processes (excluding the accompanying text) depicted on the pages entitled "Steel Rods and Wire Made From Them". So far as I can discern, the material and relevant facts, next summarized, are not in dispute.

The imported products, in the condition imported, were processed from billets, hot-rolled into wire rod approximately 7 millimeters in diameter. After hot-rolling, the wire rod was drawn, *one time,* through a die 0.204 inch in diameter to produce the imported products in the condition shipped to the United States. (R. 12–13.)

On plaintiff's side, it was testified that the purpose of drawing the wire rod one time was to select material without cracks for shipment. As one witness stated, if the hot-rolled material was shipped without being drawn one time, the percentage of scrap to the importer would increase and the importer had no facilities to melt the scrap. "Also, transportation costs across the ocean would be larger because of the higher vol-

---

**3.** Wire not over 0.703 inch in maximum cross-sectional dimension is obviously not over 0.74 inch in diameter.

ume that would be required to transport it over here in order to get the same amount of finished product." (R. 15.)

The imported products are held in plaintiff's inventory. As orders are received from customers, the imported products are removed from inventory and further drawn in the United States to wire of whatever size specified by the customer. After the final drawing, to the size specified by the customer, the wire is annealed and inspected to determine that it meets the customer's requirements for roundness and quality. (R. 15.)

Plaintiff on several occasions, did sell selected small quantities of the imported products without further processing to accommodate customers in unidentified emergency situations. The imported products are not, however, usually offered or sold in the United States in the condition imported. (R. 72.)[4]

Plaintiff's first witness Erik Hagglund was of the opinion that the imported products were semifinished because they were unsuitable to be used as a finished product until reprocessed by drawing into finished wire of finer sizes. (R. 34.) As explained by one of plaintiff's witnesses, importations fall into two categories, finished material and reprocessing material. Finished material is imported on order from a specific customer and the material is immediately unpacked and checked by plaintiff's quality control department. Reprocessing material is stored without being unpacked or checked until it is released to the production department as required. Any defects in the reprocessing material show up during the drawing operation (R. 81), which is one of the reasons why the hot-rolled product is drawn one time before importation. (R. 95.)

Defendant's witnesses testified that the term "semifinished" identifies a product held in inventory for further processing (R. 104); that it refers to everything that is a hot-rolled product down to and including hot-rolled rod (R. 130–131), and that in the

steel industry the term "semifinished" refers only to hot-rolled products at some stage in the sequence of production steps. (R. 170.) Finished wire, according to defendant's witnesses, is wire that is in a condition that it can be sold to a customer (R. 105) and wire that is drawn to give it that degree of concentricity that it can be used to fabricate an article, if it is not desired to further process (draw) it into other sizes. (R. 151.) One of defendant's witnesses testified that the term "finished" was not used in the stainless steel industry. Defendant's witnesses were firm in their opinions that, in the steel industry, once wire rod passes through a die (i. e. is drawn one time), it becomes wire.

When asked what the term "process wire" meant in the steel industry, it was stated that the term referred to "unfinished" or "partly finished" wire held in inventory for further processing; that the term included wire that had been drawn one time, and means "anything that's not a finished product." (R. 116.)

There is also testimony that the imported products are "round" (R. 50) even though from an engineering standpoint perfect roundness is impossible to achieve. (R. 197.) No witness was able to demarcate a point that would distinguish a "round product" from an "approximately round" product and it was left as a matter of degree. (R. 198–199.)

■ Defendant has mustered several points which it argues support its position that one drawing is definitionally sufficient to change hot-rolled wire rod into finished drawn round wire. One point is grounded on the testimony defendant adduced that in the steel industry wire rod becomes wire at the point that it is drawn through a die the first time. However, in *C. J. Tower & Sons (Buffalo) v. United States,* 48 Treas.Dec. 636, Abs. 49897 (1925), similar testimony adduced by defendant to support classification of certain wire as "round wire" rather

---

**4.** At the close of plaintiff's evidence, defendant moved to dismiss the case on the ground that *prima facie,* the evidence did not support plain-

tiff's claims. (R. 97.) In view of the result reached in this decision, the motion is denied.

than as "wire rods" was relatively rejected and the wire held dutiable as "wire rods" for the following stated reason:

> We do not believe that the testimony herein offered by the Government warrants a finding of fact that this merchandise consists of wire, merely because it has been drawn. We deem it safer to follow the congressional view that there are rods which are cold-drawn, and that such drawing does not of itself make the rods dutiable as wire. At least, before nullifying a specific provision for such rods, positive testimony of the most convincing character should be submitted establishing as a fact that there exist no such rods in the trade and commerce of this country. The present record contains proof that there are such rods, and that the merchandise in question is of that class. [Page 637.] [See also, *E. Dillingham, Inc. v. United States,* 49 Cust.Ct. 34, C.D. 2357 (1962).]

Defendant's additional points are not arguably persuasive. The testimony that it is impossible to achieve perfect roundness in wire undercuts the substance of defendant's point that the imported products are not definitionally "approximately round". Material cited by defendant relevant to the classification of wire rods under paragraph 315 of the 1930 Tariff Act, if anything, makes a stronger case for classifying the imported products as wire rod than as round wire. *C. J. Tower & Sons (Buffalo) v. United States, supra.*

■ As in *Tower, supra,* the opinion testimony in this case is also divided on the question of whether the imported products drawn one time are "wire rods" as claimed or "round wire" as classified. The definition of "wire" in TSUS definitively refers to a finished drawn product. This record preponderantly establishes that the imported products are not finished drawn because they are held in the importer's inventory for further processing by drawing in the United States. In fact, defendant's witnesses testified that wire held in inventory for further processing by drawing is known in the industry as "process wire". It is not

a "finished product." (R. 116.) As to the understanding in the steel industry, it is stated:

> * * * As soon as a rod has been given a draft [the operation itself is called drawing], it is thereafter designated as a wire, though many more drafts and various other treatments may be necessary to work it into wire of the size, finish and temper desired. In wire-drawing plants, any wire which, following the initial drawing from the rod, is to receive further work or treatment before it is finished is designated as *process wire.* After the first draft from the rod, process wire may be finished in various ways. [*The Making, Shaping and Treating of Steel,* U.S. Steel Corp., 8th ed., page 783 (emphasis quoted).]

■ For the steel industry to say that "process *wire*" is wire and includes a product that is drawn one time but unfinished strikes me as irreconcilably at odds with the statutory definition that, for the purposes of TSUS, "wire" is a finished drawn product. Factually, I am of the opinion that while the instant importations fit the commercial description of "process wire", they are in fact a hot-rolled product that has been drawn one time and they must be further processed by additional drawing. I find and conclude, therefore, that the imported products are "semifinished" rather than "finished". As *inter alia* defined in TSUS, wire rods are semifinished hot-rolled products. The fact that the TSUS definition essentially incorporates the judicial construction given the term "wire rods" in the *Tower* case or, at very least, is not at odds with the judicial construction of the term, is indeed some indication that Congress approved the *Tower* decision. *United States v. Curley-Bates Co.,* 46 CCPA 14, C.A.D. 688 (1958); *United States v. Great Pacific Co., Shui Tai & Co.,* 23 CCPA 319, T.D. 48192 (1936).

For the reasons stated, I am brought to follow the *Tower* decision. Accordingly, I hold that the imported products are properly dutiable under TSUS item 608.78 as wire

rods, of alloy iron or steel, tempered, treated or partly manufactured.

Judgment will enter accordingly.