The UNITED STATES, Appellant,

v.

The KANTHAL CORPORATION,
Appellee.

Customs Appeal No. 76–27.

United States Court of Customs
and Patent Appeals.

April 21, 1977.

Barbara Allen Babcock, Acting Asst. Atty. Gen., Rex E. Lee, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Chief, Customs Section, Mark K. Neville, Jr., New York City, attorneys of record, for appellant.

Barnes, Richardson & Colburn, attorneys of record, New York City, for appellee, James Caffentzis, Rufus E. Jarman, Jr., New York City, of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and SCOVEL RICHARDSON, Associate Judge, United States Customs Court.

MARKEY, Chief Judge.

This is an appeal by the Government from a judgment of the United States Customs Court, C.D. 4644, 414 F.Supp. 616, 76 Cust.Ct. 124 (1976), sustaining Kanthal's protest of the classification of imported steel alloy products under item 609.45, Tariff Schedules of the United States (TSUS), as "Round wire: * * * Alloy iron or steel." The Customs Court held classification to be proper under item 608.78, TSUS, as "Wire rods * * *: * * * Alloy iron or steel: Tempered * * *." We reverse.

### Issue

The issue in this case is whether the imported steel alloy products are properly classifiable as "Wire rods" or as "Round wire."

<hr/>

1. Cold drawing is a process in which wire rod is pulled through an appropriately sized die which reduces its size.

Statute

The TSUS and pertinent headnote provisions are:

Wire rods of iron or steel:

  \*  \*  \*  \* . \*  \*  \*

Alloy iron or steel:

  \*  \*  \*  \*  \*  \*  \*

608.78  Tempered, treated, or partly manufactured . . . . . . . . . . . \* \* \*

  \*  \*  \*  \*  \*  \*  \*

Wire of iron or steel:

  \*  \*  \*  \*  \*  \*  \*

Round wire:

  \*  \*  \*  \*  \*  \*  \*

609.45  Alloy iron or steel . . . . . . . . . . \* \* \*

Subpart B headnotes:

  \*  \*  \*  \*  \*  \*  \*

3. _Forms and Condition of Iron or Steel._— For the purposes of this subpart, the following terms have the meanings hereby assigned to them:

  \*  \*  \*  \*  \*  \*  \*

(f) Wire rods: A coiled, semifinished, hot-rolled product of solid cross section, approximately round in cross section, not under 0.20 inch nor over 0.74 inch in diameter.

  \*  \*  \*  \*  \*  \*  \*

(i) Wire: A finished, drawn, non-tubular product, of any cross-sectional configuration, in coils or cut to length, and not over .703 inch in maximum cross-sectional dimension. The term also includes a product of solid rectangular cross section, in coils or cut to length, with a cold-rolled finish, and not over 0.25 inch thick and not over 0.50 inch wide.

### Description of the Imports

The imported steel alloy products were manufactured in Sweden by Kanthal's parent company, Aktiebolaget Kanthal. Manufacture of the imported steel alloy products began with steel alloy cast into ingots. Those ingots were hot-rolled into billets which were, sequentially, cold-inspected, annealed, and hot-rolled into wire rods approximately 7 millimeters (.275 inch) in diameter. The wire rods were inspected, pickled (cleaned), annealed, and cold drawn [1] down to 5.18 millimeters (.204 inch). The resulting steel alloy product (.204 product) was annealed, pickled, inspected and shipped to Kanthal.

Upon arrival in the United States, the .204 product was separated by Kanthal into two categories. One category, a finished product,[2] was held for sale to custom-

<hr/>

2. From the testimony it appears that the criteria used to adjudge whether the .204 product was "finished" were: (1) size tolerance, (2) roundness tolerance, and (3) resistance in ohms per foot length.

ers. The other category was held for further processing (drawing) to fulfill specific customer specifications. Testimony indicated that, on rare occasions, the .204 product being held for further processing was sold to customers without that further processing.

## The Arguments

The Government contends that the .204 products are properly classifiable as "Round wire" under item 609.45, TSUS. That contention is premised on three arguments.

First, the Government points out that the .204 products exceed industry roundness tolerances for "wire rods" and, in fact, exceed industry roundness tolerances for "wire." [3] That "excess roundness," the Government contends, results from the drawing process because hot-rolling per se is not sufficient to achieve that degree of roundness. The Government argues that Congress, by using "*Round* wire" (emphasis added) in the TSUS and "approximately round" in the headnote 3(f) definition of "Wire rod," intended the degree of roundness to have a bearing upon classification. Therefore, the Government concludes the .204 products, being more "round" than "approximately round," should be classified as "Round wire" under item 609.45, TSUS.

Secondly, the Government notes that testimony clearly established an industry-recognized demarcation point at which "wire rod" becomes "wire." That demarcation point is the step of drawing. The .204 product having been drawn, the Government argues, makes the product a "wire" rather than a "wire rod" for tariff purposes.

Finally, the Government urges that the .204 products meet the headnote 3(i) definition of "wire" as a "finished" product. "[F]inished," according to the Government, merely means that a particular point in the manufacturing process has been reached; not necessarily that the product is in a condition ready for sale to a customer. The

Government contends that industry recognizes that point to occur at the drawing stage.

Kanthal, on the other hand, supported by British Steel Corporation and British Steel Corporation, Inc. as amicus curiae, contends that "round" and "approximately round" are not mutually exclusive. In fact, it is argued, the closer an object is to being "round," the more accurately it is described as "approximately round." Furthermore, Kanthal and amicus contend, if Congress had intended to use degree of roundness as a criterion for classification, Congress would have used more precise terms than "round" and "approximately round."

Secondly, Kanthal and amicus argue that the tariff acts and the trade do not regard drawing as an operation which transforms "wire rod" into "wire." Kanthal and amicus cite *C. J. Tower & Sons (Buffalo) v. United States,* 48 Treas.Dec. 636, Abs. 49897 (Bd.Gen.Appr.1925), *Peterson Steels, Inc. v. United States,* 35 Cust.Ct. 315, Abs. 58864 (1955), and *E. Dillingham, Inc. v. United States,* 49 Cust.Ct. 34, C.D. 2357 (1962) in support of that position.

Lastly, Kanthal and amicus argue that the imported .204 product is not "finished" as that term is used in industry and in the headnote 3(i) definition of "wire." Therefore, it is argued, the imported .204 product is "semifinished" and falls under the headnote 3(f) definition of "Wire rod" rather than the headnote 3(i) definition of "Wire."

## Customs Court

With respect to the degree of roundness argument, the Customs Court noted testimony indicating that it was impossible to achieve perfect roundness. Therefore, the court concluded, the imported .204 products fulfilled the headnote 3(f) "approximately round" language.

The court relied upon *C. J. Tower,* supra, as refuting the Government's argument that industry considered drawing as transforming wire rod into wire.

3. Industry out-of-round tolerances, according to the testimony, are plus or minus .025 inch for wire rod and plus or minus .002 inch for wire. Kanthal's import exhibit measured only .0003 inch out-of-round.

Regarding the "finished" versus "semi-finished" argument, the court held that the "record preponderantly establishes that the imported products are not finished drawn because they are held in the importer's inventory for further processing by drawing in the United States." 414 F.Supp. at 619, 76 Cust.Ct. at ——. The court noted that Government testimony adduced at trial demonstrated that industry regarded such products as "process wire"—not a finished product. That, the court held, was inconsistent with the headnote 3(i) definition of "Wire."

## OPINION

We find nothing in the TSUS, or in the record before us, which would indicate that Congress intended to distinguish "wire rod" from "wire" on the basis of roundness. In fact, the context of the TSUS, namely the wire provisions of items 609.20 et seq., indicates that Congress simply intended to distinguish between "Flat wire," "Round wire," and "Other wire." There is no evidence to indicate that Congress intended "Round," in item 609.45, to have any relation whatsoever to "approximately round" in the headnote 3(f) definition of "Wire rod."

There was substantial evidence adduced before the Customs Court that industry considered drawing to be the indicia of "wire." That evidence was not rebutted by Kanthal. Nonetheless, the Customs Court deemed *C. J. Tower,* supra, controlling as establishing that one drawing does not convert "wire rod" into "wire."

*C. J. Tower* involved substantially the same question raised herein, i. e., at what point in the manufacturing process does "wire rod" become "wire"? In that case, as here, there was unequivocal testimony that industry considered "wire rod," once drawn, to be "wire."

The 1922 statute under consideration in *C. J. Tower* provided:

Par. 315. Wire rods: Rivet, screw, fence, and other iron or steel wire rods, whether round, oval, or square, or in any other shape, nail rods and flat rods up to six inches in width ready to be drawn or rolled into wire or strips, all the foregoing in coils or otherwise, valued at not over 4 cents per pound, three tenths of 1 cent per pound; valued at over 4 cents per pound, six-tenths of 1 cent per pound: *Provided,* That all round iron or steel rods smaller than twenty one-hundredths of one inch in diameter shall be classified and dutiable as wire: *Provided further,* That all iron or steel wire rods which have been tempered or treated in any manner or partly manufactured shall pay an additional duty of one-fourth of 1 cent per pound: *Provided further,* That on all iron or steel bars and rods of whatever shape or section which are cold rolled, cold drawn, cold hammered or polished in any way in addition to the ordinary process of hot rolling or hammering, there shall be paid one-eighth of 1 cent per pound in addition to the rates provided on bars or rods of whatever section or shape which are hot rolled; and on all strips, plates, or sheets of iron or steel of whatever shape, other than polished, planished or glanced sheet iron or sheet steel, which are cold hammered, blued, brightened, tempered, or polished by any process to such perfected surface finish or polish better than the grade of cold rolled, smoothed only, there shall be paid two-tenths of 1 cent per pound in addition to the rates provided on plates, strips, or sheets of iron or steel of common or black finish of corresponding thickness or value.[4]

Two points concerning that statute must be emphasized. First, the statute, in its first proviso, distinguished "wire rod" from "wire" on the basis of diameter, i. e. wire rods smaller than .20 inch were to be classified as "wire" rather than as "wire rod." Second, wire rods which have been subjected to cold drawing were specifically included within the provision for "wire rods" by virtue of the third proviso, which added an extra duty to cold drawn "wire rods."

---

4. Tariff Act of 1922, ch. 356, para. 315, 42 Stat. 858.

The board in *C. J. Tower* held that the statute evidenced a "congressional view that there are wire rods which are cold-drawn, and that such drawing does not of itself make rods dutiable as wire." 48 Treas.Dec. at 637. Of course, the statute at issue therein makes it clear that Congress intended to differentiate between "wire" and "wire rod" on the basis of diameter rather than drawing, as industry would do. If the board had adopted the industry definition of "wire," the provision referring to cold drawn "wire rods" would have been nullified.

. *C. J. Tower* was relied upon by the Customs Court in *Peterson Steels, Inc. v. United States,* supra, in holding imports to be dutiable as "wire rods" rather than as "wire." Although *Peterson Steels* involved the Tariff Act of 1930, ch. 497, 46 Stat. 590, paragraph 315 of that Act was identical to paragraph 315 of the Tariff Act of 1922 involved in *Tower.*

In *E. Dillingham, Inc. v. United States,* supra, the Customs Court found that certain copper imports, which had been heated, hot-rolled, and once drawn, were properly classified as copper rods rather than as copper wire. In that case, expert testimony adduced that the trade considered those particular imports to be rods rather than wire. The testimony showed, *inter alia,* that industry commonly referred to those imports as copper rod; that those imports were not useable as wire; and, that further drawing was required to make the imports wire.

The determinative question before us is whether Congress, in enacting the present Tariff Schedules, intended to adhere to its earlier distinction between "wire rods" and "wire" or to adopt the drawing distinction recognized in industry. We are convinced that Congress chose the latter course.

A comparison of paragraph 315 of the Tariff Acts of 1922 and 1930 with the present statute reveals that the "Wire rod" provisions, items 608.70 through 608.78, encompass much of former paragraph 315, including the first two provisos. Nothing in items 608.70 through 608.78, however, nor in the headnote 3(f) "Wire rod" definition, refers to cold drawing. The term "drawn" now appears in the headnote 3(i) "Wire" definition, whereas "cold drawn" had previously appeared in the third proviso of paragraph 315.

With respect to headnote 3, the *Tariff Classification Study* (TCS), schedule 6, at 90 explains:

> Most of the proposed provisions in headnotes 2 and 3 are new, inasmuch as the existing provisions are for the most part silent as to the various distinctions involved. *It is believed that the proposed provisions conform to the greatest possible degree with existing trade practices.* In large measure the achievement of this result is due to the very effective cooperation received from representatives of the domestic industry and from interested importers. All major points of controversy have been resolved in the final proposals. [Emphasis added.]

Under paragraph 315, as pointed out above, an additional duty was levied upon products which had been subjected to cold drawing. Kanthal's position would result in no additional duty being levied for the step of drawing wire rod, whereas under prior law there was such additional duty levied. Absent clear statement to the contrary, we are not persuaded that Congress so intended.

The statute does not distinguish between products drawn once and those subjected to multiple drawing operations. Nor have we been cited to any evidence that a rod must be subjected to 3, 5, 7, or to any specific number of drawing operations before it becomes "wire."

We are convinced that Congress, in enacting the present statute, sought to distinguish between "wire" and "wire rods" on the basis of "existing trade practices." TCS, supra. *Esco Manufacturing Co. v. United States,* C.A.D. 1167, 530 F.2d 949, 63 CCPA —— (1976). It is clear from the record that industry regards drawing as the distinguishing factor between "wire" and "wire rod." Thus, the commercial designa-

tion of "wire" would include that which has been once drawn, and the commercial designation of "wire rods" would be inapplicable to a product which has been once drawn.

In an effort to carry its burden of proving the government classification to have been in error, Kanthal concentrates its fire on the word "finished" in headnote 3(i). Though one of Kanthal's own witnesses testified that he regarded finished .204 products as "wire" and that it was sold as such, Kanthal forcefully argues that the .204 products cannot fulfill the headnote 3(i) "Wire" definition because most of the .204 products it imported are "semifinished," as opposed to "finished." Another witness for Kanthal testified that in his opinion products held for reprocessing were not "finished" products. "[F]inished" products, in his opinion, were products suitable for sale to the ultimate consumer. The Government argues with equal force that "finished," as used in the TSUS, merely refers to some stage in the manufacturing process, not to whether the goods may be further processed for sale to a consumer.

One of the Government's witnesses testified that "wire" held for further processing is termed "process wire" but that such wire nonetheless meets the definition of "Wire" contained in headnote 3(i). Though the Customs Court equated "process" with "unfinished" or "semi-finished," the equation is based on the view that "process wire" may, after importation, be drawn further to meet the requirements of particular customers. The term "process wire" does not, of course, appear in the statute and nothing of record establishes that "process wire" has not been finished as wire, though subject to further finishing, or "processing," to meet certain customer specifications.

Kanthal says the Government's interpretation of "finished" would equate it to "drawn" as used in headnote 3(i) and would thus render one or the other term superfluous. The Government answers that drawing is only "one method (cold rolling is another) of finishing a product" and that it would be administratively unworkable to rest the determination of whether wire is "finished" upon what may or may not be done to it after importation.

Although there is testimony in the record indicating that what is "finished" depends upon the eye of the beholder, that amorphous concept cannot serve. We are convinced that Congress intended "finished" in a definitive commercial connotation. From the record as a whole, we glean the essence of "finished," as used in industry and, hence, in the TSUS, to be the condition of the wire as wire, the product at that point and in that state being useable as wire. The record is clear that some of the imported product was set aside for resale (and was resold) without further processing and that some of the imported product, though set aside for further processing, was in fact resold without further processing. Thus, the manufacturer had drawn the product once, making it "wire," and had completed all of the processing steps necessary for the product to be imported, sold, and used as wire. It was at that point "finished" wire. That Kanthal subjected most of the wire to additional drawing to meet the needs of certain of its customers merely amounted to changing what was already wire to wire of a smaller diameter. Whatever further processing Kanthal may have elected to perform on some portion of the .204 product could not deprive the product of its status as "finished" at the time of importation. We agree with the Government that to require that classification depend upon an importer's election to further process the imported product would lead to administrative chaos and is not dictated by the statute.

In sum, the .204 product, at the time of importation, was round; it was drawn; it was finished; hence, it was "Wire" as defined in headnote 3(i) and was properly classified under item 609.45, TSUS.

Accordingly, the judgment of the Customs Court is *reversed*.